AO 106 (Rev. 12/03)   Affidavit for Search Warrant

*ORDERED SEALED BY COURT*

AUSA

unsealed 8/12/08

# UNITED STATES DISTRICT COURT

## SOUTHERN _____ DISTRICT OF _ CALIFORNIA _____

· In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

404 47TH STREET ·
SAN DIEGO, CA 92102

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: **'08 MJ 8483**

I, __BRAD A. GALVAN_____ being duly sworn depose and say:

I am a(n) __SPECIAL AGENT WITH ATF_____ and have reason to believe
                                    Official Title

that   ☐ on the person of or   ☑ on the property or premises known as (name, description and/or location)

REFER TO ATTACHMENT A

in the _____ SOUTHERN _____ District of _ CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

REFER TO ATTACHMENT B

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

(1) property that constitutes evidence of the commission of a criminal offense; and
(2) property designed and intended for use or which is or has been used as a means of committing a criminal offense

concerning a violation of Title _____18_____ United States Code, Section(s) __5861(d) and (f)__

The facts to support a finding of probable cause are as follows:

REFER TO ATTACHED AFFIDAVIT OF ATF SPECIAL AGENT GALVAN.

**FILED**

MAY 30 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Continued on the attached sheet and made a part hereof:   ☑ Yes   ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

MAY 30, 2008   @ 10:07 a.m.       at   EL CENTRO _____ CALIFORNIA
Date                                                              City                                      State

Peter C. Lewis            U.S. Magistrate Judge            _____
Name of Judge            Title of Judge                        Signature of Judge

## ATTACHMENT A

### *ITEMS TO BE SEIZED*

The items to be seized are evidence of violations of Title 18, United States Code, Section 842 (i) (1) and Title 26, United States Code, Section 5861 (d) and (f) specifically:

A. Any and all computer software and hardware including, but not limited to, hard drives, diskettes, zip diskettes, compact diskettes, Secure Digital cards, Compact Flash cards, Memory Sticks, Micro Secure Digital cards, DVDs, and any other flash memory devices.

B. Any and all bomb making components and/or bomb making paraphernalia including, but not limited to, the following:

> 1. Black powder, smokeless powder, and/or other incendiary/explosive materials, along with containers for these materials (specifically, but, not limited to, the Hodgdon brand).

> 2. Gasoline, other flammable liquids, and containers for such liquids.

> 3. Threaded metal or PVC pipe, metal end caps or "nipples".

> 4. Fuses, (specifically, but, not limited to, green "hobby type" fuses).

> 5. Nails.

> 6. Adhesive material including, but not limited to, duct tape.

7. White fabric or cloth

C. Any and all bomb building items including, but not limited to, bench type vises, pliers, scissors or other cutting tools, drills, drill bits, brooms, vacuum(s), garbage can(s), instructions and/or manuals which illustrate the building of explosive devices.

D. Any and all receipts evidencing the purchase of bomb making components, bomb making paraphernalia, and/or bomb building items, as stated above.

E. Any and all sketches, maps, building diagrams, photographs of potential target locations.

F. Any and all handwritten notes indicating an intention to build, construct, place, detonate, sell, or trade a bomb, explosives, or explosive device.

G. Any and all trace evidence including, but not limited to, incendiary/explosive material, metal shavings, cloth, hairs and fibers and/or adhesive material.

H. Any and all clothing resembling the following: dark or brown pants, dark jacket or dark hooded jacket, hooded sweat shirt, dark hat, dark knit cap, or dark beanie, white or light colored shoes, white or light colored gloves to include latex style gloves.

I. Any and all souvenirs of the crimes including, but not limited to, newspaper clippings, video recordings, and/or other mediums of media coverage, and/or photographs relating to the bombing of either the courthouse or the Federal Express Office.

J. Oral and/or Buccal swabs and head hair samples for the purposes of conducting Deoxyribonucleic Analysis hereinafter "DNA").

K. Any and all cellular telephones, personal assistance devices (hereinafter "PDA"), Global Positioning Satellite (hereinafter "GPS") devices, cameras, camera film answering machines, and/or scanners/facsimile machines.

L. Any and all documents and records relating to ownership, management and control of the above described locations including, but not limited to, rental agreements, rental payment documents, mortgage records and/or utility bills.

M. Any and all documents and records relating to ownership, management and control of cellular telephone(s) owned by Ella Louise SANDERS and related telephone bills.

N. Any and all weapons and/or illicit narcotics.

## ATTACHMENT B

I believe I have probable cause to search the premises located at 404 47th Street, Apartment #5, San Diego, California, 92102.

404 47th Street, Apartment #5, is further described as follows: 404 47th Street, San Diego, California, 92102, is an apartment complex called Harbor View, located on the west side of 47th Street, between Hartley Street and Castana Street. Harbor View consists of 10 separate two-story, beige stucco apartment buildings, with slate blue trim along the eaves of the buildings. Apartment #5 is located in Building #8. Building #8 consists of Apartment #5 through Apartment #11 with all entrances facing south. The south side of Building #8 also has a white sign with blue writing that reads "Bldg 8, Units 5-11." The entrance to Apartment #5 is south facing and is the apartment furthest east in Building #8. Apartment #5 has a inner white door with an outer white painted security door. The inner door to Apartment #5 is labeled with the number "5" in approximately 3 inch black numbering.

**AFFIDAVIT**

I, Brad A. Galvan, being duly sworn, depose and state:

I am a Special Agent with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and I have been so employed for over nineteen years. I am currently assigned to the FBI Joint Terrorism Task Force (JTTF) out of the San Diego Field Office, where my primary investigative responsibilities are to conduct counter-terrorism investigations.

In 1989, I graduated from the Federal Law Enforcement Training Center and the ATF National Academy where I underwent eighteen weeks of intensive training in firearm, arson and explosives investigations to include post blast and advanced post blast investigation techniques. In 1994, I attended and completed the ATF Certified Explosives Specialist (CES) Course and the United States Military Explosive Ordnance Disposal School in Indian Head Maryland, where I successfully completed the Improvised Explosive Device (IED) course. I have also been an instructor in both Post Blast and Advanced Post Blast courses and I have taught these courses to other local, state and federal investigators. Throughout my nineteen years as a Criminal Investigator, my primary duties have been the enforcement of both state and Federal Firearm, Explosive and Arson laws. In that capacity, I have participated in hundreds of investigations into the possession of firearms and explosives, and/or the possession and use of explosives, arson and/or destructive devices. In my nineteen years as a federal law enforcement officer, I have

participated in the preparation and execution of hundreds of search and arrest warrants involving various violations of federal firearm and explosive laws and have qualified as a subject matter expert in both State and Federal court on both subjects.

## VIOLATIONS BEING INVESTIGATED

Your affiant is investigating violations of Title 18, United States Code, Section 842(i)(1), Felon in Possession of Explosive Materials, and Title 26, United States Code, Section 5861 (d) and (f), to make or possess a firearm (Destructive Device) in violation of the provisions of this chapter. Under Title 26, United States Code, Section 5845 (a) (1) (8) the definition of a firearm includes the term 'destructive device'.

In preparing this affidavit, I have relied upon my own personal knowledge of this investigation, as well as, information made available to me by other law enforcement officers, agencies, and telecommunications systems.

Because this affidavit is being submitted for the limited purpose of obtaining search warrants for the location identified herein, I have not set forth each and every detail obtained over the course of this investigation.  I have only set forth those facts and circumstances that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the aforementioned violations are presently located at the premises identified herein.

## PREMISES TO BE SEARCHED

Based on the facts and circumstances laid out below, I believe probable cause exists which justifies the search of the residence located at 404 47th Street, Apartment # 5, San Diego, California 92102. The residence is further described as follows:

404 47th Street, San Diego, California, 92102, is an apartment complex called Harbor View, located on the west side of 47th Street, between Hartley Street and Castana Street. Harbor View consists of 10 separate two-story, beige stucco apartment buildings, with slate blue trim along the eaves of the buildings. Apartment #5 is located in Building #8. Building #8 consists of Apartment #5 through Apartment #11 with all entrances facing south. The south side of Building #8 also has a white sign with blue writing that reads "Bldg 8, Units 5-11." The entrance to Apartment #5 is south facing and is the apartment furthest east in Building #8. Apartment #5 has a inner white door with an outer white painted security door. The inner door to Apartment #5 is labeled with the number "5" in approximately 3 inch black numbering.

## BACKGROUND ON THE RECENT BOMBINGS IN SAN DIEGO

On April 25, 2008, at approximately 1:30 a.m., an explosive device detonated at the Federal Express Distribution Center in San Diego, California. Local law enforcement responded to and investigated this incident. The Metro Arson Task Force (MAST) was

given responsibility to complete the investigation and therefore took custody of the evidence collected.  No suspects were identified by the initial investigation.

On May 4, 2008, at approximately 1:41 a.m., a bomb was detonated adjacent to the eastern entrance (front doors) of the Edward J. Schwartz Federal Courthouse (hereinafter "courthouse"), located at 940 Front Street, San Diego, California.

## INITIAL INVESTIGATION

Representatives of multiple state and federal public safety agencies assigned to the Joint Terrorism Task Force, including your affiant, responded to the courthouse bombing to conduct a post blast investigation. A preliminary post blast investigation revealed that an unknown person placed a backpack type bag at the entrance to the courthouse door. This backpack is believed to have contained an Improvised Explosive Device (IED). Upon ignition, this device exploded causing substantial damage to the courthouse and creating a blast wave which sent shrapnel several hundred feet from the point of origin. Your Affiant observed evidence recovered at the scene which is consistent with the components of an Improvised Explosive Device, specifically, a device which had been constructed of galvanized steel pipe, end caps and explosive filler, such devices are more commonly referred to as "Pipe Bombs".

## EVIDENCE RECOVERED AT THE COURTHOUSE

The FBI's Evidence Response Team (ERT) collected physical evidence of the bombing. ERT collected multiple pieces of debris believed to have originated from the explosive device. Several pieces of metal debris were enmeshed in tattered pieces of white fabric, which appeared to have been part of the device prior to its detonation. A piece of pipe fragment located in front of the courthouse had an adhesive label which identified the product's stock-keeping unit (SKU) number. It has been determined from the SKU number, that this specific pipe was previously sold to and shipped to a Home Depot store in California.

## INVESTIGATION OF CONNECTIONS BETWEEN TWO BOMBINGS

Investigators on the morning of May 4, 2008, considered whether or not the earlier bombing on April 25, 2008, at the Federal Express Distribution Center in San Diego, California was related to the federal courthouse bombing. Accordingly, the physical evidence from that bombing was taken into FBI custody and sent to the FBI Laboratory for comparative analysis.

The local investigators who investigated the Federal Express device explained that it consisted of two pipe bombs. One of them detonated first, apparently extinguishing the ignition device on the other pipe bomb, leaving it unexploded in the nearby parking lot where it came to rest.

## PRELIMINARY LABORATORY ANALYSIS

The FBI laboratory reported that the unexploded pipe bomb recovered at the Federal Express Distribution Center contained powder that was preliminarily determined to be consistent with *Hodgdon's TRIPLE SE7EN* (trademarked spelling) brand powder in the FFG granular size.  This powder appears to be an improvement on and a derivative of an earlier *Hodgdon* product called *Pyrodex*.  Both are considered to be black powder substitutes.  The analysis of the bulk powder from this device also indicated that gasoline was present.

The FBI laboratory reported that the dimensions of the two pipes used in the Federal Express Distribution Center bombing were identical.  They were of one inch nominal diameter and eight inches in length.  The pipe bomb that detonated had a product identification sticker on it.  The sticker provided the following information regarding the pipe – "1" x 8" GALV STEEL PIPE NIPPLE."

The FBI laboratory reported that the device used at the federal courthouse consisted of three separate pipe bombs.  One consisted of a two inch nominal diameter pipe nipple that was ten inches in length while the other two were one and a half inch nominal diameter pipe nipples that were ten inches in length.  All three were made of galvanized steel.  Preliminary examination of residue from fragments of these pipes indicated it was consistent with *Pyrodex* or black powder.  Additionally, gasoline was identified on fragments

of the black cloth material that came from the back pack destroyed during the fire and bomb detonation.

Debris from both bombings indicated that nails were incorporated into their design. The types of nails used in the two bombings appeared to be consistent with one another. The author is aware that additional metal components, such as nails, are usually added to bombs in order provide an enhanced anti-personnel effect upon detonation.

### PURCHASE OF POWDER AT EL CAJON GUN EXCHANGE

Your affiant personally reviewed the Powder Permit sales record from the El Cajon Gun Exchange, 427 Broadway, El Cajon, California. The record revealed that on March 26, 2008, Ella Louise SANDERS purchased one (1) pound of *Hodgdon's TRIPLE SE7EN* powder from the El Cajon Gun Exchange. SANDERS used a valid California Identification Card, in her own name, # N7031186 as identification to purchase the explosive powder. This specific type of explosive powder (Hodgdon's triple se7en) is consistent with preliminary laboratory reporting regarding the Federal Express Distribution Center pipe bomb that did not detonate, as also containing Hodgdon's triple se7en as the explosive filler. SANDERS purchased this explosive powder in violation of Title 18, United States Code, Section 842 (a) (1) Felon in Possession of Explosives.

## INTERVIEW OF ELLA LOUISE SANDERS

On May 20, 2008, your affiant, along with Chula Vista Police Detective Agent Dave Marshall, interviewed SANDERS at the Riverside County Jail, where she is currently in custody awaiting trial on state robbery charges. After being read a copy of her Constitutional Rights, SANDERS agreed to waive her right to remain silent or to have an attorney present and agreed to speak with investigators. SANDERS told me that she currently lives at 404 47th Street Apt. #5, in San Diego, California; however, she frequently stays at her nephew's home in Menifee California. SANDERS told me that sometime in late March she purchased explosive gun powder from the El Cajon Gun Exchange in El Cajon California. SANDERS identified this powder as Hodgdon's triple seven. SANDERS also told me that she stole several galvanized steel pipe fittings and end caps from the Home Depot in Riverside and San Diego to use as components for building pipe bombs. SANDERS admitted to building four Improvised Explosive Devices (pipe bombs) with the purchased gun powder and the stolen galvanized steel pipe fittings. SANDERS also admitted to testing these devices by igniting them in an open field near a residential area in Menifee California. Sanders constructed these Improvised Explosives Devices in violation of Title 26, United States Code, Section 5861 (d) and (f) to make or posses a firearm (destructive device) in violation of this chapter.

## ADDITIOANL INTELLEGENCE

Your affiant was told by Detective Agent Dave Marshall that on May 15, 2008, he interviewed Ella SANDERS while she was in custody at the Riverside County Jail. SANDERS told him that sometime in late March, she had previously constructed two Improvised Explosive Devices and that she attempted to test them by igniting them in an open field near a residential area in Menifee, California. SANDERS told Marshall that the devices did not function and she left them there for fear of retrieving them. After the interview on May 15, 2008, SANDERS took Detective Marshall to the exact area (field) where she had left the devices and pointed out were she believed the pipe bombs were. The following day, Bomb Squad personnel from multiple state and federal agencies searched for and found an intact Improvised Explosive Device (pipe bomb). The device was constructed of galvanized steel pipe with end caps and contained explosive filler. The device was rendered safe by bomb squad personnel and collected as evidence.

## SANDERS'S PRIOR FELONY CONVICTION

Your affiant conducted a computer criminal history check on Ella Louise SANDERS with positive results. The record indicates that SANDERS has an extensive criminal record dating back to 1969. The record further reveals that SANDERS has five (5) Felony convictions, including convictions for narcotics and burglary. On May 28, 2008,

your affiant spoke to State Parole Agent Steve Kiser, who told me
that on June 28, 2006, in the San Diego Superior Court, Ella Louise
SANDERS was convicted of California Health and Safety Section 11350
(a), possession of a controlled substance and sentenced to two years
in state prison.   On April 19, 2007, SANDERS was paroled to 404 47th
Street apt # 5 San Diego, California 92102 and is currently on active
parole. This address is the most current address of record; State
Parole has listed for SANDERS.

### PERSISTENCY OF EVIDENCE AT THIS LOCATION

Based upon my training and experience in conducting explosive
investigations, I know that persons who construct and posse's pipe
bombs often leave evidence of these crimes at their place of
residence. As the individual components necessary to construct these
devices are in most cases legal to possess most bomb makers leave
components and or traces of bomb making material at locations or
places where they have access to or reside at. These types of bomb
making components would include various types of steel and or PVC
pipes, end caps, duct tapes, drills, fuses, nails used as
fragmentation, explosive powders. The process of drilling a hole
in metal or other types of hard objects creates small shavings which
are easily overlooked and often left in the location of the drilling.
Also, powders like *Hodgdon TRIPLE SE7EN* with FFG sized granules
are easily spilled and very likely could be left behind as residue

in the location where a bomb was assembled.   Therefore, your affiant believes that this type of evidence, as well as other trace evidence, is likely still located in the residences or locations where assembly took place.

### SEARCHES OF COMPUTERS AND OTHER DIGITAL EQUIPMENT

Based upon information related to me by other law enforcement agent, I know that digital evidence can be stored on a variety of systems and magnetic, optical and mechanical storage devices including, but not limited to, hard disk drives, floppy disks, CD-ROMs, DVD-ROMs, magnetic tapes, magneto optical cartridges, personal digital assistants, pagers and memory chips.

Computer forensic agents (CFA) will be available during the execution of this search warrant to ensure that any computer systems are properly shut down and packaged for transport.   FBI personnel will also instruct me on the proper manner in which to safely transport any seized digital media to a secure Evidence Storage Facility.

Any computers or computer systems, as defined in Attachment "B", found at the locations to be searched.   Rather, with the assistance of the computer forensic agents, any computers or computer systems found will be seized, transported from the scene, imaged at the Regional Computer Forensic Laboratory (RCFL), and examined. This procedure is justified for two reasons.   First, as set forth above, there is sufficient probable cause to show the Court that

the computers and computer systems contain contraband, constitute evidence of the commission of a criminal offense, and/or were used as the means of committing a criminal offense.

Second, searching computers and computer systems is a highly technical process that requires specific expertise, equipment and software. There are a multitude of different types of computers manufactured today, many of which use proprietary hardware and software during the creation of any user data. It is impracticable for the law enforcement community to have all the proper adapters, cables, cords and other hardware devices necessary to consistently link law enforcement forensic equipment with all known and unknown computer systems on an immediate basis while searching "on-site." Much of this specialized equipment is available, but may need to be acquired in order to conduct a proper forensic examination.

There are literally thousands of different software programs that can be commercially purchased and installed on a user's computer system. As computer security has become an ever-increasing priority to many consumers, much of today's commercially available software is developed for, or provides, data security and encryption which makes it difficult to afford an accurate representation of any digital evidence confronted with on-site. Moreover, it is not feasible for a Computer Forensic Examiner to be familiar with every software program, past or present, now commercially available. It may be

necessary for a CFA to train with a particular type of software in order to fully understand the capabilities of that software.

In order to safeguard the integrity of a computer forensic examination, it is imperative that the CFA first make a complete image of the original digital evidence before conducting a forensic examination. The CFA must ensure that any images made are forensically sound and that these forensic images can be fully restored, if necessary. There are numerous pitfalls that can seriously hamper the integrity of the imaging process while on-site. For example, to make a forensically sound image of targeted original digital evidence, the CFA must ensure that there is an adequate uninterruptible power supply. Digital evidence is extremely fragile and susceptible to power interruptions or power surges. It is not always practical for a CFA to bring backup power supplies into the field.

Additionally, it may be necessary for the CFA to have unrestricted access to the original digital evidence during the course and scope of the forensic examination. There are numerous operating systems now being used by consumers. Some of these operating systems include, but are not limited to, DOS, Windows 3x, Windows 9x, Windows NT, Windows 2000, Macintosh, Linux, Unix, Novell and PICK. These operating systems use different file structures, different partition formatting and different file commands. Moreover, many of these operating systems are "hardware" specific.

This means that a restored image of original digital evidence may not be "bootable" or "viewable" without the actual original hardware. This would prevent the CFA from viewing the restored digital image in a manner consistent with the structure of the original digital evidence. This problem is especially acute when dealing with operating systems like Linux, Unix, MAC and Novell.

These problems are accentuated by the fact that it is possible for a user to have two or more different operating systems on the same piece of original digital evidence. This severely hampers the CFA's ability to image this type of original digital evidence on-site due to certain software limitations. This type of problem generally requires that the imaging process take place in a controlled environment, such as the RCFL. Once this procedure is completed, a CFA can then safely conduct most types of requested examination using this newly created "image" file without fear of damaging, destroying, adding or altering any files or operating system components of the original digital evidence.

It is also very difficult in today's computer environment to "search" for specific data while on-site. To conduct any type of digital "search" without using a forensically created image predisposes multiple forensic problems. It may literally take hours, if not days, to appropriately search a medium to large size hard drive for any desired data. For example, a search for the word "kill" during a homicide investigation could find thousands

of positive hits; due to the fact that while a subject may have in fact wanted to kill the victim. The term "kill", however, is also a valid computer command related to the ending of an otherwise innocuous computer process.

Computers can be difficult to examine even if no serious effort is used to conceal or protect its digital contents. A complete forensic search is not limited to examining files normally displayed by the operating system. It also includes the expansion of compressed data and the recovery of deleted file data. It involves the areas on a computer hard drive that the computer system recognizes as being "in use" and those areas that the computer that the computer system deems "available for use." This search may involve an examination of "slack" space, which is the information at the end of a sector or cluster beyond the end of the "current" usage. Finally, the complete examination would address "orphaned" data, portions of files left behind by earlier operating system activity. All of these areas require operating specific tools and techniques to access the data.

It is also very easy for a computer user to conceal data or other types of digital evidence through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension "jpg" are digital image files. A moderately sophisticated computer user, however, can easily change the .jpg file extension to "txt" or "dll" in order to conceal or

mislead law enforcement into thinking the digital image is actually a text or system file. While it is may be possible for a CFA to notice this during a properly controlled forensic examination, it is difficult for that same CFA to do detect this concealment during an on-site examination. For example, the Windows 9x Operating System, installed right out of the box, would itself contain over 20,000 different system files. A devious user could then alter any improper files so as to make them appear to be legitimate files.

The problems noted above are compounded by the fact that the volume of data stored on a typical computer system is so large that it would be unrealistic to search for specific data while conducting an on-site examination. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 60 gigabytes of data and are commonplace in new desktop computers.

Additional problems are created by the growing use of destructive programs or "booby traps." These programs can destroy or alter data if certain forensic procedures are not scrupulously followed. Since digital evidence is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as the RCFL, is essential to conducting a complete and accurate examination of any digital evidence. This problem

mandates that all examinations need to take place using only a forensic image of the original digital evidence.

Finally, there is also a growing use of military-grade encryption by consumer and commercial computer users. These encryption programs, which are low or no cost, are widely available and allow users to encrypt specific data with just a few keystrokes. These encryption problems are accentuated by other newer technologies, like steganography, which allows a user to conceal information within other files. It is difficult to detect the use of this technology without a proper forensic examination and the ability to look at the entire image of the subject digital evidence.

For the reasons set forth above, I respectfully request that I be allowed to seize all computers and computer systems, as defined in Attachment "B," and transport them to the RCFL for a proper forensic examination including imaging and searching.

The term "computer" as used herein is defined as set forth in 18 U.S.C. § 1030(e)(1), and includes any electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

Based on training and through my personal use of computers, I have knowledge of the method by which e-mail and other files are

transmitted over telephone lines or cable between computers.    Based on my training and knowledge I know the following:

a.    With the modem, a computer user can transport a computer file to his own computer, so that the computer file is stored in his computer.    The process of transporting a file to one's own computer from another is called "downloading."

b.    The user can then view the file on his/her computer screen (monitor), and can "save" or retain the file on his/her computer for an indefinite time period.

c.    In addition to permanently storing the file on the computer, the user may print the file.

d.    The original file that is downloaded is also maintained in the originating computer.

e.    With the modem, a computer user can send a file from the computer to another individual on the Internet.    This process of sending a file is called "uploading."

f.    The process of "uploading" is similar to the "downloading" process except the user is sending the computer file to others instead of retrieving the information from another computer.    As with the process of "downloading," the original file is maintained on the originating computer.

g.    A user can also use an e-mail program to send files to another individual on the Internet.    Most e-mail programs allow the user to attach files to the e-mail.    The attached

files may be documents or images.  Again, the original file
is maintained on the originating computer.

### CONCLUSION

Based on the aforementioned information, your affiant believes
that probable cause exists to search the identified location.

Your affiant, therefore, respectfully requests that the
attached warrant be issued authorizing the search and seizure of
the items listed in Attachment A.

Brad A. Galvan
Special Agent
Federal Bureau of Alcohol, Tobacco,
Firearms and Explosives


Sworn and subscribed before me
this 25th day of May, 2008

PETER C. LEWIS
United States Magistrate Judge